## Case No. 11,284.

### The PORPOISE.

[2 Curt. 307.][1]

Circuit Court, D. Massachusetts. May Term, 1855.

SLAVE TRADE—FORFEITURE—ACT OF MAY 10, 1800 —VESSEL EMPLOYED AS TENDER TO SLAVERS.

1. Under the act of May 10, 1800 (2 Stat. 70), if the master has knowledge that two slaves have been brought on board his vessel by the supercargo, on the coast of Africa, for the purpose of being transported to Brazil, and they are so transported, the vessel is forfeited.

[Cited in The John Perkins, Case No. 7,360.]

2. Semble, such transportation works a forfeiture, though the master did not know or believe these persons to be slaves.

3. If a vessel be employed as a tender to slavers, which obtain and carry cargoes of slaves from Africa to Brazil, it is employed in the transportation of slaves, within the meaning of this act, though no slaves were taken on board the tender.

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty.

Mr. Hallett, Dist. Atty., for the United States.

Mr. Lunt, contra.

CURTIS, Circuit Justice. This is an appeal from the district court, on a libel of information against the brig Porpoise, Richardson, claimant. The libel is founded on the first section of the act of May 10, 1800 (2 Stat. 70), which provides, "that it shall be unlawful for any citizen of the United States, or other person residing within the United States, directly or indirectly to hold or have any right or property in any vessel employed or made use of in the transportation

or carrying of slaves from one foreign country or place to another, and any right or property belonging as aforesaid, shall be forfeited, and may be libelled and condemned for the use of the person who shall sue for the same."

It appears in evidence that the Porpoise, being owned by the claimant, a resident citizen of the state of Maine, arrived at Rio de Janeiro, in June, 1843, under the command of Cyrus Libby, also a citizen of the state of Maine, the owner being on board. On the fourteenth day of June, 1843, the brig was chartered by the master, to Manuel Pinto de Fonseca, a resident of Rio, by a written charter-party, for one year, or until the termination of any voyage in which she might be engaged at the end of the year. The master was to victual and man the vessel. The charterer had the right to put on board any lawful merchandise, and any free persons as passengers, and to send the vessel to any port, the voyage being lawful. Under this charter-party the brig made three voyages from Rio to the coast of Africa. The first was to St. Thomas, in the Gulf of Guinea; the second was to Cabindka Bay and the Congo river on the west coast; the third was to different points on the east coast. On her return from the last-mentioned voyage, in January, 1845, the brig was seized by the commander of the Raritan, a public armed vessel of the United States, and in July, 1845, the libel in this case was filed. The suit remained in the district court until December, 1848, when it was brought to this court by appeal from a decree dismissing the libel, said to have been made without a formal hearing, and here it has remained, until this term of the court, without any action of the court thereon being invoked by either party, save that at the last term, the district-attorney endeavored to obtain a hearing, but the case was continued by order of the court on cause shown. The cause of this great delay is said to have been that some deposition had been mislaid by Mr. Rantoul, while district-attorney, and only recently found. I have thought it proper to advert to this extraordinary delay, which is so much out of the usual course of the court, for the purpose of saying that it is in no degree attributable to the court, while held by my predecessor, or by myself, and not to declare that any blame is justly to be attributed to any law-officer of the government who has formerly been charged with this prosecution; a matter, as to which the court is not informed.

It is proved to my entire satisfaction, by direct and positive evidence, which is in accordance with many circumstances, that one Paulo, a Brazilian, in the employment of Fonseca, and who sailed in the brig, from Rio, on her last voyage, as supercargo, purchased, at two of the Portuguese settlements on the east coast of Africa, among many other slaves, two boys, named by him, or some former master Pedro, and Guillaume.

1 [Reported by Hon. B. R. Curtis, Circuit Justice.]

These boys had been reduced to slavery by being made captives in war, and they were sold by their owners to Paulo. They were brought in the brig to Rio, and on the passage waited on Paulo and performed some other services about the table at which the passengers took their meals. If these boys were slaves and were actually transported from Africa to Brazil, then this brig was made use of by her supercargo in the transportation of slaves from one foreign country to another, and the case is brought directly within the terms of the act of congress. But it is insisted by the claimant, that though purchased by Paulo as slaves, they were emancipated before they came on board, and Captain Libby's deposition and the papers produced by him are relied on to support this allegation. The substance of Captain Libby's statement in regard to Pedro is, that when the supercargo brought him on board he told him he was free, and that he, Libby, could go to the governor of the place and get his free papers and passports; that he did go, and received from the governor the papers which he produces. These purport to be a notarial certificate declaring that one Avelino Xavier de Minares, had emancipated his slave Peter, of the Landine nation, in consideration of the good services he had rendered him; and also a petition by Peter de Souya, a free black, a native of Lourenya Margues, of the nation of Landine, declaring that he wishes to make a voyage to Rio, for his interest, in the Porpoise, and an answer of the governor that he is permitted to do so. In respect to these papers, it must be observed, that there is nothing tending to prove that the person, named in the notarial certificate as emancipated, was the same Pedro brought to Rio; and there is not a little proof that he was not the same. Paulo brought him and held him as a slave; and there is no pretence that he emancipated him. The person named in the certificate, as the owner, is Avelino Xavier de Minares. If, therefore, this Pedro, who came to Rio in the Porpoise, was emancipated as shown by this certificate, by De Minares, how came he to be sold to Paulo as a slave, and to be held by him as such until brought on board the vessel? Pedro himself has been examined, and seems to be a reliable witness. He testifies he was Paulo's slave, never emancipated, and brought away from Africa in the Porpoise against his will. In substance, the same facts are proved concerning the other boy, Guillaume. I am not satisfied that the allegation that they had been made free by emancipation, is made out in proof.

But it is urged that Captain Libby had reason to believe, and did believe, they were free persons; and that the vessel cannot be condemned, if the master, by mistake, transported slaves, believing them to be freemen. I am not called on to decide whether a cause of forfeiture can be made out, under this act of con-gress, if it should be proved there was no intentional concurrence, by an owner, or master, in the illegal employment of the vessel. It is by no means clear that the act requires such concurrence. There are many cases in which the vessel is treated as the offending thing, and is forfeited, wholly irrespective of the guilt of the owners, or the master. The Malek Adhel, 2 How. [43 U. S.] 233. The terms of the act do not require the transportation of slaves should be with the knowledge or consent of the master; any more than with the knowledge or consent of the supercargo. And therefore, if it were needful to decide the question, I should hesitate to impose on the government, the burden of proving the consent of the master, or to extend to the claimant, an exemption, upon the ground of mistake by the master, which is not provided for in the act. But I am convinced that Captain Libby is affected with notice of the actual condition of these boys. In the first place, as will be more fully stated presently, the Porpoise was, in fact, for months previous to the time when the boys came on board, acting as a tender to slave vessels, belonging to, or in the employment of Fonseca, the charterer of the Porpoise. Her supercargo, who brought these boys on board, was the agent of Fonseca, to purchase cargoes of slaves for their slavers; and did so purchase and ship them, with the knowledge of Captain Libby. How he could have supposed Paulo, this slave-trader, came into possession of these two negro boys except by buying them as slaves, and for what lawful purpose, or by what authority he could have thought they were to be transported from their native country to Brazil, he does not explain in his deposition, and certainly it is not easy to conjecture. He says he went to the governor and obtained Pedro's passport. This passport purports to be granted, upon a petition in writing by Pedro de Souya, declaring his desire to make the voyage for the benefit of his interest. Who presented that petition? Pedro swears he was brought away against his will. There is no reason to suppose he petitioned, or authorized any one to do so. Did Captain Libby present it? He says he went to the government and got the passport. Did he take the preliminary step to get it? If so, by what authority? He gives no account of this. Nor does he pretend that when these negro boys were brought on board by the slave-dealer, who had just sent to sea two cargoes of slaves, he made any inquiries of either of them whether they had come on board of their own free-will, or desired to go to Brazil under the protection of Paulo. It is proved also, that on at least two occasions, when cruisers were in sight, the boys were concealed; and that on one of these occasions, the captain interposed to cause one of them to go below into the run. I am not convinced that Captain Libby believed these boys were free on the coast, and would remain so when landed in Brazil, in the custody of a man known to him as a slave-trader. But I think this case may, and should,

be rested on another ground. It was held by Mr. Justice Story in The Alexander [Case No. 165], that the actual transportation of slaves was not necessary to induce a forfeiture under this act; it being sufficient that the vessel was employed in the business of transporting slaves. A similar decision was made under the second section of the act, by the supreme court, in U. S. v. Morris, 14 Pet. [39 U. S.] 464. Under this construction of the act. the question is, whether this vessel, even if no slaves were actually carried by her, was not engaged in the business of transporting slaves between Africa and Brazil.

Without undertaking to detail the evidence or to give a history of all the movements of this vessel, or of the course of these criminal enterprises, it may be said, that about the period in question, the slave-trade was carried on by residents of Brazil, by making contracts to purchase American vessels. deliverable on the coast of Africa at some designated point, where it was expected a cargo of slaves would be ready to be placed on board. The American vessel, commanded by a citizen of the United States, and manned in part at least by our citizens, and registered as a vessel of the United States, sailed under our flag to the coast of Africa; and when the time arrived for the cargo of slaves to be put on board, the American master and crew left the vessel, took away the American papers, she was delivered to a Brazilian commander and crew, and with or without papers, took her departure from the coast. It is quite apparent, that to the successful conduct of such voyages, some other vessel or vessels besides those sent over to bring back the slaves, were, if not absolutely necessary, undoubtedly useful and desirable. They were needed to carry to the coast, the merchandise to be used to purchase the slaves,—to transport the agent of the slave merchant who was to sell on the coast this merchandise, and with it, or its proceeds, buy the slaves; and also to receive on board, as passengers, the American masters and crews who navigated the slave-ships to Africa, and there left them, when the cargoes of slaves were brought on board. Now it clearly appears that this brig served this purpose throughout her last voyage. There was carried in her to the east coast of Africa a cargo of merchandise, intended to be used to buy slaves, to be transported to Brazil. This cargo was used for this purpose. Paulo, the supercargo, had, under the charter-party, the power to order the vessel to go to and remain at any port, to suit the purposes of this traffic. He actually exercised this power; and two cargoes of slaves were bought by him, with the cargo of this vessel or its proceeds, and shipped in full view of the master of the Porpoise. The American master and crew of one of these vessels were received on board the Porpoise, when the cargo of slaves was carried on board the slaver; and the American master of the slaver went from the slaver to the Porpoise, and from the Porpoise to the slaver, carrying his ship's papers, and the flag of the

United States, as the fear of the cruiser of one nation or another might seem to render expedient. The Porpoise also aided one of these slavers, going in company with her into a barred harbor on the coast, to get over the bar, by relieving her of part of her cargo; and there is evidence tending to show that Paulo, the supercargo of the Porpoise, who controlled her movements, actually gave orders for the manœuvring of one of these slave vessels, while on the deck of the Porpoise; and that the two went to sea in company, after the slaves were shipped, the Porpoise manœuvring so as to attract the attention of any cruiser which might be in the neighborhood. It is also proved that the course of this voyage and its purposes and objects, were substantially the same as of the next preceding voyage; though there was not then such open and active participation in the trade. The master of the Porpoise, and probably others interested in her movements, seem to have acted on the belief, that so long as they did not have slaves on board the vessel, the vessel was not made use of in the transportation of slaves. I think otherwise. In my opinion Fonseca, the Brazilian slave-trader, who chartered this vessel, made use of her in the business of transporting slaves from Africa to Brazil, where he employed her as a tender to his slave-ships, to accompany them from port to port; to aid them in their navigation, or in eluding cruisers; to deliver cargo to buy their slaves; to carry his agent who had the general conduct of the business; to receive on board the officers and crews of the slavers, when their ownership was changed; and thus to take an active, needful, and open part in the general conduct of these enterprises. And if I were satisfied this vessel had never had a slave on her deck, I should still be of opinion that she had been engaged in the business of transporting slaves, as much as if she had been captured with a slave deck, extra water casks, provisions and irons, before a slave had been brought on board, as in the cases of The Alexander [supra], and U. S. v. Morris, 14 Pet. [39 U. S.] 464, already referred to.

Let a decree be entered reversing the decree of the district court, and pronouncing for the forfeiture.

After the proceeds of the vessel had been paid into the registry, a question was made whether they should be distributed by a decree of the court, or be paid into the treasury of the United States, to be distributed under the direction of the secretary of the navy, as in case of prize money, as is required by the act of March 3, 1849, § 8 (9 Stat. 378).

This question having been briefly argued by Hallett, district-attorney, the following opinion was given.

CURTIS, Circuit Justice. The question is raised whether the proceeds of the sale of this vessel are to be distributed by an order of this court. among those entitled thereto. or paid into the treasury of the United States to be

distributed under the direction of the secretary of the navy. The act of March 3, 1819, § 1 (3 Stat. 532), provides that the proceeds of vessels seized by public vessels of the United States, and condemned for the violation of any law prohibiting the slave-trade, shall be equally divided between the United States and the officers and men making the seizure; "and the same shall be distributed in like manner as is provided by law for the distribution of prizes taken from an enemy." The sixth section of the act of April 23, 1800 (2 Stat. 52), enacted, "that the prize money belonging to the officers and men shall be distributed in the following manner." Then follows a specification of the share or proportion to be assigned to each officer and man. The act of 1819, referred to this, then existing law, concerning the distribution of prizes simply for a rule of distribution. Its purpose was, to ascertain the share or proportion which should be assigned to each officer and man. It had no reference to the mode of making sales of the vessel seized, nor to the custody of the proceeds, nor to the authority under whose direction the distribution should be made. These things are otherwise provided for by law. The vessel having been seized is required to be brought within the United States, and there proceeded against by a libel of information in the proper district court. This being done, the marshal, under a warrant from the court takes possession, and if no claimant takes the vessel on bail, and a condemnation follows, the court orders the vessel to be sold. This order the marshal executes, acting under a warrant from the court, and he pays the proceeds into the registry. If the vessel be bailed, the stipulation is in place of the property, and after a condemnation the court compels the claimant or his sureties to pay into the registry of the court the amount at which the vessel was valued, with or without interest according to circumstances. This is the settled and uniform course of proceeding, and there is no sufficient reason to suppose congress intended to change it, or did interfere with it by the eighth section of the act of March 3, 1849 (9 Stat. 378). The purpose of that section was to repeal the then existing laws concerning prize agents, and to have the marshal make all sales of prize property, and deposit the proceeds in the treasury of the United States, where that part of the proceeds to which the officers and men should be entitled, was to be distributed under the direction of the secretary of the navy. In other words this law does relate, exclusively, to the mode of making sales of prize property, the custody of the proceeds, and the authority under which distribution should be made. It has no reference to what the act of 1800 calls, and the act of 1819 refers to, as "the manner" of the distribution; that is, the shares or proportions in which the proceeds are to be distributed. If therefore the act of 1819, which adopts the manner of distribution of prizes, we e construed to refer not only to the then existing laws on that subject, but to all laws

which might from time to time be passed, concerning the manner of distribution of prizes, a construction not consistent with its language, I should still be of opinion that the law of 1849 has no effect on this case, for it has made no change in that manner of distribution which is adopted by the act of 1819.